Okay. You may call the next case. These numbers 15 15 63 and 15 16 0 7 in L.R.B. vs. Jack here incorporated oral argument not to exceed 15 minutes per side Mr. Stone for the response. Morning, morning, your honor. I'm James Stone from the law firm Jackson Lewis. I honored to appear before this Honorable Tribunal again. I represent Jag Healthcare doing business as Galleon Point in this matter. My clients officers Jim Griffith and Dave Cooley are here in the first row. My co-counsel Karina Kendrick is also here at the table. I'd like to reserve two minutes of my time for rebuttal. First, let me say this is not a case about a company aggressively fighting union representation, which many of the cases that the N.R.B. cites in many of the cases this court reviews on this topic on Galleon Point, which is administratively managed by Jag Healthcare, recognize the SEI union for its hourly employees in 2012 and has a labor contract in place at this time. This is rather a case about a small nursing home in a small town, Galleon, Ohio, about to close and lay off its employees and transfer all of its residents to facilities further from home and about how Jag Healthcare, a small regional nursing home chain, within a few short days, saved the residents from moving and many of the jobs and pushed through a distress sale very, very quickly. This is a case about a small business being penalized severely and inaccurately as a matter of law for two or three innocuous comments made by one of its owners, Jim Griffiths, during a couple of meetings in a single rush day when it, with little warning, was asked to take over this operation of a nursing home. The ALJ and the N.R.B. respectfully misapplied cases which involved much larger companies and much longer timelines and completely ignored the context and the more subtle legal reasoning of the cases it cites in applying this very formal, conclusory and extremely legalistic approach, the N.R.B. held that Griffiths' few innocuous comments, there were only three, were serious violations of the National Labor Relations Act and that caused all the other violations in this case to occur, the 8A1, the 8A3, the 8A5 violations. As stated in our reply brief, really the entire decision of the Administrative Law Judge here boiled down to that key determination. And we urge the court to look in context at what Mr. Griffiths said. As I said, the undisputed record shows that JAG took over the Galleon Point facility with five days of notice. There was no time to hatch the discriminatory scheme. There was no time to go through employee records and figure out who was pro-union or anything else. And nor was there really any evidence of that. Rather, JAG responded as it always did once it figured out it could do this sale and hired who they felt were the best employees from the current facility and brought in mostly its own employees from other facilities. What Jim Griffiths said, and I think it's important to note the statement, and this is the one statement that is mainly relied upon by the ALJ and the N.R.B. for the following decisions. He called the people together the day before he acquired the facility. The first time he had ever seen the employees, the first time he had made a long visit to the facility. And he said to them, he gathered the village care, the former nursing home employees together, and he said, it's up to you whether you want a union or not. There are people in my family that are parts of unions. My father was a policeman. He was, before he owned a nursing home, he was in the union. We don't have any unions in any of our buildings currently, and we think you won't need one once you look at our benefits that we have and get to know us. But initially, if you feel you want a union, it's your business. It's up to you. That's what he said. That's the coercive comment. The only other thing he said, the union representative from the SAU approached him that day and said, are you going to recognize the union? And he said, as of now, no. That's it. Now. Was there not some comment about directing nursing staff to remove any union organizers? There was. Or have police remove union organizers if they came on the premises? There was a comment. That's right, Your Honor. There was a comment in another context. He got asked a question by nursing staff, not by bargaining unit members, and no bargaining unit members heard that. But he was asked a question by nursing staff, what do we do if union organizers show up? And he said, we have a policy against solicitation. And the record will show that he said that this applies to everybody. This isn't just union organizers. But if they show up, then, and ALJ credits that, by the way, in the small print of the decision, that they have a policy against anybody. So he did make that one comment. But it wasn't heard by any bargaining unit members. And it never was applied anyway. There was no police were ever called. And it would be the same thing if they had solicitations from a life insurance company. Well, yes. But I think a union organizer did show up and was escorted off the premises. Is that right? Not by police, no. He was, the, Mr. Griffiths said that when the union organizers showed up that we don't recognize the union right now. So you're not, you know, you would not, you should not be on the property. But there was no, you know, calling of police or anything dramatic designed to. Well, wasn't there something in the record that when Court Wright asked if Griffiths would recognize the existing unit, he said he would not, stating that none of these facilities were unionized and that village care also would not be unionized. He, yes, that's what he, essentially what he said to the union organizer. He didn't actually, he, and the subsequent actions never indicated that he said they would never recognize the union. He was talking in the context of that moment. They would, the comments were we will not recognize the union. See, JAG has an operating philosophy. Obviously, they didn't have a contract with the union. That's not disputed. And all the other facilities are not union. However, what Mr. Griffiths was also resting on, and it's in the, the NRB makes a big deal that the exceptions enumerate this. But it's all through the brief. And the exception does deal with this generally. JAG, when they acquire a facility, typically, and it's very much like the, one of the cases in the record, like Dr. Pepper, or particularly I direct the court to e-essential services, which is a case involving a janitorial firm that typically acquired companies. And they would bring in their own people. What JAG historically, what JAG does is acquire small nursing homes and struggling, that are usually struggling in small towns. And the way, how do they sell, how do they make these places operate enough so that they at least break even and stay in business? They cross-train a lot of employees. That's, they cross-train far more than most nursing homes do. And what they have historically done when they have acquired a facility is they'll try to hire the best people they can find. Now here, they didn't have time to do a very, to do that very, in very much depth. But then they'll bring in lots of people from their other nursing homes to staff it because those people are cross-trained. And over, within a few weeks, they'll have a representative compliment. And then within another couple months, hopefully things are working out well. And in fact, here, Galleon Point is surviving. But Mr. Griffiths knew that was what was going to come, was going to happen. And he reasonably believed, based on objective facts, that they would not be required to recognize the union at that time. It didn't mean he would never recognize the union. In fact, they did recognize the union at a later date. And in fact, they do have a collective bargaining agreement. But there was, the court has to keep in mind, and I think this is where the administrative law judge and the NRB kind of did not apply the reasoning properly. And why their decision isn't supported by substantial evidence and is wrong as a matter of law. You have to look at the context. If you look at the essential services case, or you look at the, there's a case we cite, Dr. Pepper, which is, which some of the facts are different, but involved, again, a very compressed timeline where you've only got a few days and you're struggling, a company is struggling just to operate and open. They can't, do not have time to go through detailed personnel files. They don't, the NRB sites that we didn't, cases where the companies didn't conduct interviews of all the employees. But those are situations where the companies had months to acquire the facility. Well, they, it seems a little, it seems that it was a tad fast that they called Natalie Archer in, asked her about a comment she had allegedly made. And then fired her for a negative attitude. Well, Archer, Atkins, and Nolan, which are the three discharged. Well, I'm just asking about Archer. With Archer, I think, you know, things were admittedly chaotic, but this is a healthcare facility and a nursing home. And the NRB has always applied different standards to healthcare facilities where patient care is, you know, in patient care areas. And in a small nursing home, almost every area is, except for employment and offices, are patient care areas. And I think the bottom line is that the supervisors at Galleon Point were concerned that with all the chaos in the situation, that negative attitudes or comments made in front of residents or near residents could be disquieting. And so they made the decisions. Were those always the right decisions if they had had more time to consider them? I don't know. The court will have to decide that. The NRB makes a big point in its brief that there was not, you know, a detailed investigation, as you just point out, Your Honor, that, you know, it seems a little quick. And it was a little quick. But at this time, the staffing was shifting around all the time. Well, Ronk wasn't somebody new in the game, was she? She'd been there. No, Ronk had been there, correct.  Well, if she'd been there for a while, she must have been familiar with Natalie Archer. I mean, why at this point would you decide to terminate somebody over having made a comment that has something to do with the union? That's what makes it look at least suspicious. Well, even if the wrong decision was made by Ms. Archer, as to Ms. Archer, that does not mean, the principal violations in this case involve the comments of Mr. Griffiths and the 8A1. And in fact, if you read the decision, Your Honor, as I know you have, and look at it in detail, the administrative law judge and the NRB, essentially with Archer and the other two discharges, Atkins and Nolan, went back and looked at not just that decision, but said, well, but there's all this discriminatory animus here by Mr. Griffiths and by JAG, and that is what caused, that's what I think caused these to be taken, in our view, out of context. The bottom line is that, but for the NRB and the ALJ finding the comments to the employees about it's up to you whether you have a union, and the comments to Ms. Courtright that we're not going to have a union, at least not at the beginning, without that, I don't think the NRB would have found Archer, Atkins, or Nolan's discharges to be improper. Yeah, but the problem is, it suggests that somebody had talked to Ronk. She was the one involved in the termination, the actual termination. Well, with all due respect... She would not be someone who would just decide out of thin air to terminate somebody. Well, there was no, with all due respect, Your Honor, there's no finding to that effect. There's, basically, the finding was that the reasons given by the company probably were true, but in view of the alleged discriminatory animus before, in a way it's perhaps drawing the same inference you are, in view of the so-called discriminatory animus before, those decisions, even though we admit that they were done in a quick manner because things were running very quickly and things were not organized, but without, again, without crediting the animus, the so-called animus by Mr. Griffith in his comments to the employees and to Courtright, I don't think you get there. I don't think you get to the inference. You know, you're telling me there was chaos, but on the 30th of June, the place was operating with staff and nurses, and on July the 1st, it was still operating. All the residents were there. The staff was there. The nurses were there. I mean, what chaos ensued? They're just carrying on at the facility. Sure. The situation was that we had only, our client, Jag, only hired 15 of the employees and brought in, over the course of the next months, about 30 of its own. That's the course of the months. I'm talking, you're back. As of the first day. You're telling me there was chaos on July the 1st. No, as of the first day, they had 16 additional employees in, and who was, the management was uncertain who was in charge of what. Again, Jag had five days to set up this operation. So it wasn't just, and the company, keep in mind, Village Care was going to close. This was not acquiring a facility that was smoothly operating, and they did a deal. They were about to lay off everybody. Answered my question. Okay, thank you, Your Honor. Okay, thank you, Mr. Stone. Good morning, Your Honor. May it please the Court, David Seid for the Labor Board. The Board found that Jag committed numerous unfair labor practices through the application of uncontested credibility-based factual determinations to uncontested legal principles. In response, Jag has essentially asked this Court to act as a trier of fact by relying on a combination of discredited evidence, as well as entirely new arguments raised to the Court for the first time. I would like to start out by addressing why the Board very reasonably found that Jag was a successful employer with an obligation to recognize and bargain with the union as of July 1st, and then why the Board further found that Jag lost the ability to set initial terms and conditions of employment as of that date, because in the process it will also encompass some of the other unfair labor practices found by the Board. Very simply, the principles of success were not in dispute. On July 1st, Jag began operation with the same business. All the supervisors rolled right over, and it had the same residents and patients that it was taking care of. The Board further reasonably found that as of that date, 15 of the 23 employees serving in unit positions had previously worked for their predecessor in unit positions. Fifteen of? Twenty-three, Your Honor. And in Jag's opening brief, it reiterated an argument raised to the Board that it was really 15 out of 31. But in the opening brief, it doesn't take any issue with the very detailed reasoning for why the Board found that it was 15 out of 23. In the reply brief, Jag raises a new argument for the first time, that of those 15, some of them didn't work sufficient hours to actually be counted as unit employees. Of course, an argument raised for the first time in a reply brief is not properly before the Court. But more importantly, having never been raised to the Board, this Court has no jurisdiction to consider it. So the Board very reasonably found that Jag was a successor employer. And the next question that the Board very reasonably answered affirmatively is that Jag lost the ability to set the initial terms and conditions of employment. And if I could take a big step backwards, because if this Court were actually sitting as an initial trier of fact, even under Jag's own argument, it was one unit employee short of having an obligation to, or precluded from setting the initial terms and conditions of employment. And notwithstanding the fact that every single supervisor, and this is a finding of fact made by the Board, every single supervisor just rolled right over that it came one employee short, it just kind of happened. Now, I suspect an initial trier of fact, if this Court were sitting in that position, would be a little skeptical of that claim. But of course, this Court is not sitting as a trier of fact. There are Board findings, there are credibility determinations. And here, the Board very reasonably found for two very specific and different reasons that Jag did not have the ability to set initial terms and conditions of employment. First, the statement that was made by Jag's CEO and President on the day before. And this was, as the Board found, a very affirmative statement. That Griffiths advised employees that Jag's other nursing homes were not unionized. This is at page 1875 of the Board's decision. And that as of July 1st, Galleon Point would not be a unionized facility either. And under a well-settled case law that Jag does not dispute, it's set forth in the Board's opening brief. When an employer makes that affirmative statement before it's conducted any of its hiring, that statement along with the fact that Jag ended up actually hiring within to fill unit positions, a majority of employees had worked for the predecessor in unit positions, an employer loses the ability to set the initial terms and conditions of employment. What about the argument that those statements are less coercive because Mr. Griffiths said something like, but you, employees, you'll be able to decide on your own or make a decision about the union at some point? Your Honor, that's not sufficient because the employees have a union. And unless Jag conducts its hiring in a non-discriminatory way and ends up where a majority of those had not worked for the predecessor, that union simply rolls over. So when once Jag's president tells employees there will not be a union, and in fact, Jag acted on it, it conducted its hiring that at least in its view, it thought it would not have the obligation to recognize and bargain. Simply telling employees that in the future, you can start from scratch, well, there's no reason to have to start from scratch if Jag conducts its hiring in a non-discriminatory way. Excuse me, unless Jag conducted its hiring in a non-discriminatory way and the people working in unit positions, the majority had not come from the predecessor, that's the only basis or possibility of which Jag would not at least have an initial obligation, even if it could set initial terms, but that it would still have to recognize and bargain with the union. And so that's why that statement isn't sufficient. And the second reason why the Board very independently found that Jag had an obligation to continue to recognize and bargain with the union was its discriminatory hiring practices. And very simply, this whole argument now about Jag not having enough time, not only is that a new argument raised for the first time before this Court, but this was not very complicated. Jag had a listing of the unit employees. It knew how many unit members there were. And whether they had five days or five months, it's not all that complicated to know. And in fact, as the Board found, Jag actually marked how many union employees it was hiring or how many from the unit it was hiring. And once it got to what it thought would be a number, that would be one below what would require it to bargain and recognize with the union, it stopped hiring them. It's not very complicated. And I would also note that with respect to the affirmative defenses that Jag had raised with respect to its discriminatory hiring, those are all way before the Court. Because before the Board, Jag had raised a number of arguments such as that it didn't actually hire enough to have hired all 22 over the subsequent several months, that some of them weren't qualified, and that some of them hadn't filed applications. All of those were rejected by the Board, mainly on credibility grounds. And Jag, in its opening brief, did not dispute any of those Board findings. And so, independently, those are the two reasons why Jag not only was a successful employer with an obligation to recognize and bargain with the union, but also could not set the initial terms and conditions of employment. And with respect to the three discharges, I would simply point out to the Court that there again, Jag made, particularly in its reply brief, goes through all sorts of affirmative defenses in an attempt to justify the discharges. Very simply, that is all way before this Court because before the Board, as set forth in the Board's opening brief, Jag had only challenged the Board's credibility determinations with respect to its affirmative defenses and in its opening brief to this Court, there was no credibility-based challenge. So the Board's affirmative defenses essentially stand unrefuted. And unless this Court has any questions in asking this Court to enforce the Board's order, I would very respectfully simply state this is not a close case. There were clear unfair labor practices committed by Jag, and again, in response, Jag is simply, essentially asked this Court to act as an initial trier of fact by just repeatedly relying on discredited testimony or just presenting entirely new arguments for the first time before this Court. Just out of curiosity, all of what we're talking about happened in 2010. That's correct, Your Honor. And then a union was recognized in 2013. What precipitated the recognition of the union in 2013? Your Honor, I can't answer that, but the fact, and I know that Jag's counsel somehow raises that as though it's somehow a defense to the unfair labor practice findings. The idea that a party where unfair labor practices or a complaint has been issued at some point during the litigation process decides to recognize a union to cut off some liability.  And I can't specifically answer whether, you know, I could simply suggest that in most cases it's usually an employer making a decision that it wants to cut off certain liability, and so during the litigation process it might decide to at least recognize the union to do that. Thank you. Thank you, Your Honor. Thank you. Mr. Stone, do you know what the answer to that question is? Yeah, I believe at the time there was no election, Your Honor. That's what I want to know. But obviously this is not a hearing about liability calculations, but the liability stems, in this case, largely from the alleged discrimination. So that had nothing to do with cutting off liability. There was a showing of interest and the Jag became convinced the employees desired the union. All right. And using lawful means, you know, assessed that. Thank you. So, but it unfortunately did nothing to cut off the liability. It was not an election. That's all I want to know. It was, they were recognized based on a showing of interest, you know, a voluntary recognition, but it did not do anything to cut off liability, unfortunately, from Jag's perspective. As far as the NRB in its brief and today, again, goes to great lengths to argue that things have been waived. I do, without, in two minutes I don't have time to go do it, but I would urge the Court to look at the exceptions that were filed in this case and also look at Jag's brief before the NRB. These arguments have all been addressed. The issues of who was hired and how they were hired and how the vote was counted. In fact, specifically this issue that Mr. Desai mentions that of the 15 that were hired, the Village Care Collective Bargaining Agreement was kind of unusual because you were only a member of the union if you were a full-time employee. You were not a member of the union if you were a part-time employee. And of the 15 hired, there was no evidence produced by the General Counsel that of those 15 that any of them were union members. I'm sure some of them were and probably a few were not. And that argument was made previously. It's in the exceptions and it's in the brief prior. So it was not waived. Obviously, in briefing cases, you make decisions on what you emphasize and what you don't emphasize. And I think the NRB is seizing on those issues to try to claim that we did waive arguments. But we respectfully request the court do review this decision in the context of the situation of a small nursing home and look at the cases, particularly look at the essential services and Dr. Pepper and some of the other cases that involve other chaotic situations and rapid hiring. Thank you, Your Honor. Okay. Thank you, Mr. Stone and Mr. Seid for your arguments today. The case will be submitted.